[Cite as *Battaglia v. Donegan*, 2024-Ohio-6022.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CARMEN BATTAGLIA,  :

    Plaintiff-Appellant,  :

                      No. 113743

    v.  :

ANN MARIE DONEGAN, ET AL.,  :

    Defendants-Appellees.  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 26, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-967970

---

### *Appearances:*

The Ondrejech Law Firm, LLC, and Mark S. Ondrejech, *for appellant*.

Pilawa & Brennan Co., LPA, and Kimberly A. Brennan, *for appellee* William Traine.

Lewis Brisbois Bisgaard & Smith LLP, and Joseph Fiorello, *for appellee* City of Olmsted Falls.

Marshall Dennehey P.C. and Jillian L. Dinehart, *for appellee* Ann Marie Donegan.

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Plaintiff-appellant, Carmen Battaglia ("Battaglia"), appeals an order granting summary judgment in favor of defendants-appellees, Ann Marie Donegan ("Donegan"), William Traine ("Traine"), and the City of Olmsted Falls ("Olmsted Falls" or "the city") (collectively "appellees"). Battaglia claims the following errors:

> 1. The trial court erred by granting summary judgment on plaintiff Battaglia's defamation claim and false light claims on statute of limitations grounds.
>
> 2. The trial court erred in finding that the plaintiff could show no set of facts to prove that the August 31, 2017 statements about Gilles and Battaglia by Donegan and Traine (by extension, the city) were false.
>
> 3. The trial court erred in granting defendant-appellees' motions for summary judgment on plaintiff-appellant's breach of contract claim because the court's finding that plaintiff-appellant can prove no set of facts that would prove the statements made in the press conference were disparaging.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Donegan was the mayor and safety director of Olmsted Falls from 2014 to 2017. During her tenure, Donegan sought to reform the Olmsted Falls Police Department to enhance efficiency and professionalism. At the start of Donegan's term, co-plaintiff Daniel Gilles ("Gilles") was the Chief of Police, and Battaglia was a lieutenant in the department.

{¶ 4} On August 2, 2015, Donegan's then 11-year-old son was speaking with his grandmother on the phone and complained that his mother was yelling at him. Donegan's sister overheard the conversation, recorded the call, and then called the

Olmsted Falls Police Department for a wellness check. Members of the Olmsted Falls Police Department responded to Donegan's home, spoke with her, and observed that her son "looked fine." (Battaglia depo. p. 29.)

{¶ 5} Donegan's sister followed up on the wellness check with Battaglia. According to Battaglia, Donegan's sister came to the police station, spoke with officers, and played the recorded phone conversation. After listening to the phone call, Battaglia thought the child was afraid of Donegan and informed Chief Gilles that "the mayor may have been involved in a domestic." (Battaglia depo. p. 36.)

{¶ 6} Gilles instructed Battaglia and Detective Alex Bakos ("Det. Bakos") to present the case to an outside special prosecutor to avoid any conflicts of interest. They referred the matter to an outside special prosecutor without approval from the city council. Avon Lake prosecutor, John Reulbach ("Prosecutor Reulbach"), reviewed the file and recommended a misdemeanor domestic-violence charge. Gilles testified that he chose Reulbach to serve as special prosecutor because he wanted someone outside of Cuyahoga County to consider the charges. Yet, after Reulbach recommended a single misdemeanor charge, Gilles instructed the officers to consult with the Cuyahoga County Prosecutor's Office, presumably to consider a felony offense. (Battaglia depo. p. 42-43.)

{¶ 7} No felony charges resulted from the officer's consultation with the Cuyahoga County Prosecutor's Office, and the officers returned to Prosecutor Reulbach. Prosecutor Reulbach charged Donegan with domestic violence,

misdemeanor menacing, and aggravated menacing. However, the charges were dismissed shortly thereafter due to lack of evidence. (Gilles depo. 51.)

{¶ 8} Gilles and Battaglia claim that Donegan led a "campaign of harassment" against them following her arrest and prosecution. (Complaint ¶ 21-23, and 25.) They further allege that Donegan's vendetta against them caused them to lose their jobs. Battaglia retired from the Olmsted Falls Police Department in January 2016 after a computer audit revealed he had violated the city's policies on computer use. The audit showed that Battaglia had been using his city-owned computer to do personal shopping and to watch "cheerleader wardrobe malfunctions" on YouTube. (Battaglia depo. 68-70.) Following his separation, Battaglia entered into a "Confidential Separation Agreement and Full Release and Waiver of Claims" with the city. He did not dispute the findings of the audit. (Battaglia depo. p. 68.)

{¶ 9} Traine joined the Olmsted Falls Police Department as a part-time volunteer officer in July 2014 following his retirement from the Cleveland Police Department. He resigned from his position as a reserve officer in August 2015, shortly after Donegan's arrest. Traine was not involved in the arrest and prosecution of Donegan, and from August 2015 until March 8, 2016, he was not affiliated with the Olmsted Falls Police Department.

{¶ 10} Traine returned to the Olmsted Falls Police Department on March 8, 2016, when he was appointed to the position of Assistant Deputy Chief of Police. Upon his return to the department, Traine moved into an office previously occupied

by Battaglia. On March 14, 2016, while cleaning out the desk, Traine discovered a USB drive in the bottom drawer. (Traine aff. ¶ 10, attached to Traine motion for summary judgment as exhibit B.) Traine reviewed the flash drive and discovered that it contained evidence relating to the domestic violence case against Donegan. (Traine aff. ¶ 11.)

{¶ 11} Meanwhile, in February 2016, after the domestic-violence charges against Donegan were dismissed, Donegan, through counsel, threatened to file suit against the city, claiming retaliation, false arrest, and malicious prosecution. Greg Sponseller ("Sponseller"), the Olmsted Falls law director, and another attorney representing the city, asked Traine to conduct an internal investigation in order to assess the merits of Donegan's claims.

{¶ 12} As part of the investigation, Traine interviewed several officers. Traine obtained the original police file relating to Donegan's domestic-violence case from Det. Bakos, who advised Traine that Battaglia had made several copies of the case file. After interviewing officers and reviewing the file, Traine discovered what he believed to be several improprieties in the domestic-violence case against Donegan. Traine reported the improprieties to the city's lawyers, who instructed him to conduct a full internal-affairs investigation.

{¶ 13} In December 2015, Gilles was provided a "Last Chance Agreement" that required him to complete certain tasks or face termination. Gilles admitted that he did not complete all the tasks required of him under the agreement. As a result, he was removed as Chief of Police, and Traine was appointed to serve as Interim

Police Chief in his place. Gilles and the City entered into a settlement agreement, and Gilles's termination was affirmed by a five-to-one vote of the Olmsted Falls City Council.

{¶ 14} On June 14, 2016, while Traine was reviewing paperwork left unaddressed by Gilles, he discovered a copy of a "Supplemental Report" relating to the Donegan domestic-violence case under the desk mat in Gilles's old office. Traine also found a folder containing several documents pertaining to the Donegan domestic-violence case in the file cabinet. After finding these documents, Traine asked Sponseller to contact the special prosecutor who handled the Donegan domestic-violence case to obtain the prosecutor's file.

{¶ 15} Traine reviewed the special prosecutor's file and determined that the file did not contain a copy of the "Supplemental Report" found under what had been Gilles's desk mat. The special prosecutor's file also did not contain certain recordings that were contained within the case file Traine received from Det. Bakos.

{¶ 16} The city appointed Attorney James McDonnell ("McDonnell") to serve as an outside special prosecutor to review the internal-affairs investigation. Following his review, in February 2017, McDonnell concluded there was probable cause to believe that Gilles and Battaglia committed the crime of tampering with evidence related to Donegan's domestic-violence case. McDonnell also believed that Gilles's handling of the Donegan domestic-violence case constituted dereliction of duty.

{¶ 17} After the city investigated Donegan's claims that she was falsely arrested and prosecuted, the city decided to settle with her. Pursuant to a settlement agreement executed in March 2017, the city agreed to pay Donegan $450,000 in exchange for a release of all of her claims against the city.

{¶ 18} Thereafter, "various citizens and police union representatives," including former councilman Kevin Roberts ("Roberts"), served the city with public-records requests to obtain all documents related to the arrest and prosecution of Donegan and the internal-affairs investigation. (Complaint ¶ 25.) Roberts's public-records request stated, in relevant part:

> Please provide all of the details concerning the correspondence from Ms. Donegan's attorney Terry Gilbert. As you are aware, Mayor Donegan has promised "transparency in everything related to the City of Olmsted Falls," and the citizens want the details of the settlement.

The city released the records and held a press conference on August 31, 2017.

{¶ 19} At the press conference, Traine explained the circumstances behind the domestic-violence charges that were brought against Donegan and detailed the allegations Donegan made against the city. He summarized the conclusions of the internal-affairs investigation that were the basis for the city's settlement offer. He explained that a special prosecutor had reviewed the investigation and that the special prosecutor believed there was probable cause to believe that some individuals may have committed crimes. Traine stated, in relevant part:

> Charges were issued against our mayor for domestic violence, aggravated menacing, and menacing. There was no probable cause established in this investigation for the issuing of those criminal charges, let alone for the staking of unmerited, trumped-up charges[.]

. . . Mayor Ann Donegan was subject to a politically motivated investigation to try to embarrass her and to push her out of office.

This was done by the former chief and former supervisor under him. The dismissal of the charges when it went to court proves that it isn't against the law in a disciplinary way to yell at your child the way that that occurred.

A special outside prosecutor was engaged by the city of Olmsted Falls to review our Internal Affairs investigation. His findings were that two persons mentioned in that investigation committed criminal acts, one being a police supervisor that headed the investigation. The prosecutor noted in his findings that he did not recommend pursuing criminal charges as there was probable cause but not enough to take it to trial.

. . .

The Internal Affairs investigations outline a complete retaliation against Mayor Ann Donegan as the safety director and mayor for the city of Olmsted Falls.

The investigation further articulates the retaliation was based on reform initiative[s] Mayor Donegan was launching for the police department. This report gives numerous forms of misconduct taken against Mayor Ann Donegan as well as retaliation.

The facts prove that persons mentioned in this investigation went out of their way and attempted to personally ruin Donegan's reputation and political career with no regard to her minor child.

(Press conference transcript attached to Olmsted Falls' motion for summary judgment as exhibit N.)

{¶ 20} Following the press conference, Donegan issued a written statement to the press stating, in relevant part:

I am a mother first and mayor second. My son and I have been harassed, investigated, and ultimately vindicated due to my push to reform the Olmsted Falls Police Department. Rogue police leaders, who have since left the department, tried to convict me of trumped-up charges that were dismissed less than a month after they were filed.

(Donegan depo. p. 54.)

{¶ 21} Battaglia originally filed a complaint against appellees on October 19, 2017, less than two months after the August 31, 2017 press conference. The complaint asserted a claim for breach of contract against the city and a claim for defamation against Donegan and Traine. Battaglia voluntarily dismissed the complaint on May 22, 2019, and filed a new complaint against appellees on August 27, 2019, in United States District Court for the Northern District of Ohio. The complaint in federal court asserted the same breach-of-contract claim against the city and the same defamation claim against Donegan and Traine, but it also added new claims for false-light invasion of privacy, violations of civil rights under 42 U.S.C. 1983, and other claims. The federal district court granted motions for summary judgment in favor of the defendants on the federal claims. In doing so, the court declined to exercise supplemental jurisdiction over the State-law claims and dismissed the remaining State-law claims without prejudice on August 6, 2022.

{¶ 22} Battaglia refiled his complaint against appellees in the Cuyahoga County Court of Common Pleas on August 27, 2022. The refiled complaint included the original breach-of-contract claim against the city. However, it also asserted claims for defamation, false-light invasion of privacy, breach of fiduciary duty, fraudulent concealment, promissory estoppel, equitable estoppel, conspiracy, vicarious liability, vicarious liability, tortious interference with contract, and civil liability for criminal acts against Donegan and Traine.

{¶ 23} Appellees filed separate motions for summary judgment, arguing that Battaglia's claims were barred by the statute of limitations or were otherwise unsupported by the evidence. The trial court agreed and dismissed the defamation, false-light, civil-liability-for-criminal-acts, tortious-interference-with-contract, and civil-conspiracy claims as barred by the statute of limitations. The trial court also determined that Battaglia did not have a viable breach-of-contract claim against the city, that Battaglia's promissory-estoppel claim could not be used to alter the written contract between the parties, and that his claim for equitable estoppel is a defense rather than a cause of action. Battaglia now appeals the trial court's judgment.

## II. Law and Analysis

### A. Standard of Review

{¶ 24} Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, the party being entitled to have the evidence construed most strongly in his or her favor. *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679 (1995), paragraph three of the syllabus; *Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367 (1998).

{¶ 25} The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996).

Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385 (1996).

## B. Statute of Limitations

{¶ 26} In the first assignment of error, Battaglia argues the trial court erred in finding that his defamation and false-light claims were barred by the statute of limitations.

{¶ 27} When defamation and false-light invasion of privacy claims arise from the same set of facts, there can only be one recovery. *Stainbrook v. Ohio Secy. of State*, 2017-Ohio-1526, ¶ 25. Defamation and false-light claims are both subject to the one-year statute of limitations set forth in R.C. 2305.11(A). *Id.* at ¶ 27. Further, a defamation claim accrues at the time the alleged defamatory statement is published or disseminated to a third party. *Hester v. Case W. Res. Univ.*, 2019-Ohio-1991, ¶ 11 (8th Dist.).

{¶ 28} It is undisputed that Battaglia's false-light and defamation claims are both based on statements made during the August 31, 2017 press conference, the date the claims accrued. Although Battaglia asserted a defamation claim against Donegan and Traine in his original complaint filed on October 19, 2017, he did not assert either a defamation claim or a false-light claim against the city until he filed the complaint in federal court on August 27, 2019. Therefore, Battaglia's defamation

and false light claims against the city were filed almost two years after the August 31, 2017 press conference and are, therefore, barred by the one-year statute of limitations. And, because Battaglia did not allege a false-light claim against either Donegan or Traine until he filed the complaint in federal court nearly two years after the allegedly false statements were made, the false-light claims against them were also barred by the one-year statute of limitations.

{¶ 29} Battaglia filed a timely defamation action against Traine and Donegan when he filed his initial complaint on October 19, 2017. This first complaint was filed less than two months after the August 31, 2017 press conference. However, he voluntarily dismissed the initial complaint on May 23, 2019, and he filed a new complaint in federal court on August 27, 2019. The federal district court dismissed the State claims alleged in this second complaint without prejudice on August 8, 2022, and Battaglia filed a third complaint in the Cuyahoga County Common Pleas Court on August 26, 2022.

{¶ 30} Battaglia argues the complaint he filed in federal court related back to the original October 4, 2017 filing date pursuant to Ohio's saving statute, R.C. 2305.19(A). He further asserts that the 365-day statute of limitations tolled while the case was pending in federal court and that an additional 30 days was added to the statute of limitations pursuant to 28 U.S.C. 1367(d) when the federal court dismissed his State-law claims without prejudice. The supplemental jurisdiction statute, 28 U.S.C. 1367(d), provides that the statute of limitations applicable to any State-law claims over which the federal courts have supplemental jurisdiction, "shall

be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Thus, according to Battaglia's argument, when the federal district court dismissed his defamation claim on August 8, 2022, he still had 331 days in which to refile the complaint in state court, i.e., 365 days for the defamation statute of limitations less 34 days between August 31, 2017 (the accrual date) and October 4, 2017 (the original filing date), plus the additional 30 days provided by 28 U.S.C. 1367(d).

{¶ 31} Battaglia relies on *Frysinger v. Leech*, 32 Ohio St.3d 38 (1987), for his argument that the complaint he filed in federal court related back to the original October 4, 2017, filing date pursuant to R.C. 2305.19(A), the saving statute. However, the Ohio Supreme Court expressly rejected this relation-back argument in *Wilson v. Durrani*, 2020-Ohio-6827, ¶ 25-28.

{¶ 32} In *Wilson*, the Court acknowledged that *Frysinger* states: "'[w]here R.C. 2305.19 applies, the date for filing the new action relates back to the filing date for the preceding action for limitations purposes.'" *Id.* at ¶ 26, quoting *Frysinger* at 42. However, in rejecting the claim that a subsequently-filed complaint relates back to the time of an original filing, the Court explained:

> Moreover, our statement in *Frysinger* about a refiled action relating back was dicta. *See Vogel v. Northeast Ohio Media Grp. L.L.C.*, 9th Dist. Medina No. 19CA0003-M, 2020-Ohio-854, 152 N.E.3d 981, ¶ 13. The questions presented in *Frysinger* were when a cause of action for medical malpractice accrues and whether a voluntary dismissal pursuant to Civ.R. 41(A)(1) constitutes a failure otherwise than on the merits. The statement about relation back was of no consequence to our determination of those issues, and we are not obligated to give it binding effect. *See Cosgrove v. Williamsburg of Cincinnati Mgt. Co.,*

*Inc.*, 70 Ohio St.3d 281, 284, 1994-Ohio-295, 638 N.E.2d 991 (1994) (plurality).

*Wilson* at ¶ 27. The *Wilson* Court also observed that "an action that has been dismissed without prejudice is deemed to never have existed." *Id.* at ¶ 28, citing *Antoon v. Cleveland Clinic Found.*, 2016-Ohio-7432, ¶ 24. "The saving statute anticipates the commencement of a new action, not the reactivation of the prior action, and it says nothing about the new action relating back to the filing date of the prior action." *Id.* Furthermore,

> because the saving statute specifically permits the refiling of an action beyond the expiration of the statute of limitations, so long as the refiling occurs within one year of a failure of the prior action otherwise than on the merits, there is no need for the refiled complaint to relate back.

*Id.* Therefore, the second filing of Battaglia's complaint in federal court on August 27, 2019, did not relate back to the original October 4, 2017. It merely constituted a new action pursuant to R.C. 2305.19, Ohio's saving statute.

{¶ 33} It is undisputed that Battaglia's defamation claim accrued on August 31, 2017, when Traine and Donegan gave the press conference summarizing the conclusions of the internal-affairs investigation that were the basis for the city's offer to settle Donegan's claims against the city. Therefore, the one-year statute of limitations expired on August 31, 2018. Battaglia presented a timely claim for defamation against Donegan and Traine when he filed the original complaint on October 19, 2017, but he voluntarily dismissed the complaint without prejudice on May 22, 2019. Although the statute of limitations expired in August 2018, Battaglia

was able to file a new complaint in federal court pursuant to the Ohio saving statute on August 27, 2019. Battaglia now asserts that his third complaint filed on August 27, 2022, following the federal court's dismissal, was timely filed pursuant to *McCullough v. Bennett*, 2024-Ohio-2783.

{¶ 34} In *McCullough*, the plaintiff filed a complaint against the defendant, but the court later dismissed it without prejudice due to lack of service. McCullough refiled his complaint and ultimately obtained service by publication, but the court again dismissed it without prejudice for failure to prosecute. Both dismissals occurred before the applicable statute of limitations expired.

{¶ 35} McCullough later filed a third complaint after the expiration of the statute of limitations and the defendant, Bennett, moved to dismiss the complaint, arguing it time barred because the statute of limitations had expired. Bennett further argued that Ohio's saving statute, R.C. 2305.19(A), could not rescue the third complaint because McCullough had already once dismissed and refiled the case. Bennett's argument implied that the saving statute could only be used once. The trial court agreed and dismissed the third complaint. On appeal, the Ohio Supreme Court held there is no "one-use" limitation on the saving statute.

{¶ 36} Battaglia's case is distinguishable from *McCullough*. Battaglia argues that he was able to file the third complaint pursuant to *McCullough* and that when the supplemental jurisdiction statute, 28 U.S.C. 1367(d), is applied in conjunction with the saving statute, his defamation and false-light claims are not time-barred. However, McCullough filed his first two complaints before the statute of limitations

had expired. Battaglia filed his second complaint in federal court after the statute of limitation had expired. By contrast, the statute of limitations applicable to Battaglia's defamation claim expired before he filed the third complaint in federal court. Because the applicable statute of limitations had already expired when Battaglia filed his complaint in federal court, the tolling provision in 28 U.S.C. 1367(d) was inapplicable because there was no statute of limitations to toll. *Vogel v. Northeast Ohio Media Group. L.L.C.*, 2020-Ohio-854, ¶ 10 ("Because the one-year limitations on Mr. Vogel's libel, defamation, and false-light claims had already expired by the time he filed his federal action, there was nothing left for Section 1367(d) to toll during that action.").

{¶ 37} In *Artis v. Dist. of Columbia*, 583 U.S. 71 (2018), the United States Supreme Court held that the supplemental jurisdiction statute, 28 U.S.C. 1367(d), tolls the applicable state statute of limitations for the period of time equal to the number of days the case was pending in federal court plus 30 additional days. *Id.* at 75. The *Artis* Court acknowledged, however, that this interpretation presupposes that the statute of limitations had not expired before the action was filed in federal court. *Id.* at 85. Indeed, the Court concluded that it would be "an absurdity" to interpret 28 U.S.C. 1367(d) to "permit a plaintiff to refile in state court even if the limitations period on her claim had expired before she filed in federal court." *Id.*

{¶ 38} When Battaglia filed the complaint in federal court on August 27, 2019, he did so outside the statute-of-limitations period, but within one year of his voluntary dismissal of the original complaint. He could, therefore, file the complaint

in federal court pursuant to the saving statute. However, when Battaglia filed his third complaint in the common pleas court on August 27, 2022, he did so not only after the statute of limitations had expired but also after expiration of the one-year period allowed by the saving statute.

{¶ 39} In holding that there was no "one-use" restriction on the saving statute, the *McCullough* Court acknowledged that it had previously stated, in dicta, that the "'savings statute can be used only once to refile a case.'" *McCullough* at ¶ 19, quoting *Thomas v. Freeman*, 79 Ohio St.3d 221, 227 (1997). However, the Court explained that the saving statute has been amended since *Thomas* was decided, and the old version of the statute no longer applies. *Id.* at ¶ 19. Moreover, the *McCullough* Court observed that "the concern that motivated the *Thomas* dicta—the danger that a plaintiff could indefinitely extend the expiration of the statute of limitations" did not exist in the case before it. *Id.* at ¶ 20. Indeed, the saving statute cannot permit the refiling of claims into perpetuity because to do so would defeat the statute of limitations. We must, therefore, consider the saving statute in the context of the statute of limitations.

{¶ 40} Battaglia argues, citing *Harris v. O'Brien*, 2006-Ohio-109 (8th Dist.), that the supplemental jurisdiction statute, 28 U.S.C. 1367(d), afforded him an additional 30 days in which to refile his claims in State court after the federal court declined jurisdiction, regardless of the statute of limitations. However, *Harris* pre-dated the United States Supreme Court's decision in *Artis*. In *Rebel Underwood v. Mercy Health Physicians N., L.L.C.*, 2022-Ohio-4313, ¶ 50 (6th Dist.), the Sixth

District explained that *Harris* was decided before the United States Supreme Court's decision in *Artis*, and that in light of *Artis*, it is clear that when the statute of limitations is expired prior to the filing in federal court, there is no statute of limitations to toll and, therefore, no 30-day grace period. *Id.*

{¶ 41} The one-year statute of limitations applicable to defamation claim expired before Battaglia filed his second complaint in federal court. Although the saving statute allowed Battaglia to file the second complaint in federal court, there was no statute of limitations to toll and no 30-day grace period extending the statute of limitations after the dismissal from federal court. Therefore, the trial court properly determined that Battaglia's defamation and false-light claims were barred by the statute of limitations.

{¶ 42} The first assignment of error is overruled.

## C. Evidence of Defamation

{¶ 43} In the second assignment of error, Battaglia argues the trial court erred in finding that he could prove no set of facts to prove that the statements made during the press conference on August 31, 2017, were false. However, having concluded that Battaglia's defamation and false-light claims are barred by the statute of limitations, this argument is moot. We, therefore, overrule the second assignment of error as moot.

## D. Breach of Contract

{¶ 44} In the third assignment of error, Battaglia argues the trial court erred in granting summary judgment on appellees' breach-of-contract claim. He contends

the trial court erred in finding that he could prove no set of facts that would establish that the city, through Donegan, made disparaging statements on August 31, 2017, when she published a written statement about him, in violation of the parties' separation agreement.

{¶ 45} Battaglia alleged a breach-of-contract claim against Olmsted Falls only. To prevail on a breach-of-contract claim, a plaintiff must establish (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages resulting from the breach. *180 Degree Solutions L.L.C. v. Metron Nutraceuticals, L.L.C.*, 2021-Ohio-2769, ¶ 41 (8th Dist.).

{¶ 46} Upon Battaglia's separation from employment with the city, he and Donegan, on behalf of the city, executed a "Confidential Separation Agreement and Full Release and Waiver of Claims." In interpreting contracts, the court's role is "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 11, citing *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). Where the contract terms are clear and unambiguous, we may determine the parties' rights and obligations from the plain language of the contract. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989). The interpretation of a written contract is a matter of law. *Saunders v. Mortensen*, 2004-Ohio-24, ¶ 9.

{¶ 47} The parties' agreement included "non-disparagement provision" that states in relevant part:

The Employer agrees not to make any false or disparaging comments, whether orally or in writing, including on social media networking sites, concerning Employee, and all prospective employment reference inquiries shall be provided with the Employee's last position held and dates of employment.

{¶ 48} Battaglia claims the city violated this provision when the city's mayor released the following written statement to local media:

"I am a mother first and Mayor second. My son and I have been harassed, investigated, and ultimately vindicated due to my push to reform the Olmsted Falls Police Department. Rogue police leaders, who have since left the department, tried to convict me of trumped-up charges that were dismissed less than a month after they were filed. I accepted a settlement with the city's insurance carrier on behalf of my son and myself. I feel the settlement fairly reflected the outrageous behavior of these few officers and their union legal counsel. I am proud my administration was successful and we have an outstanding and professional police department."

(Opening brief of appellant Carmen Battaglia, p. 33, quoting the Aug. 31, 2017 press conference.)

{¶ 49} Under the plain terms of the non-disparagement clause, the city agreed to refrain from making false or disparaging statements about Battaglia. Donegan's statement does not mention Battaglia by name; it speaks of "rogue police leaders who have since left the department." Although the statement does not identify Battaglia by name, it is conceivable that his identity could be determined by someone looking into the names of higher-ranking officers who recently left the department.

{¶ 50} As noted by Battaglia, the word "rogue" means "corrupt, dishonest." https://perma.cc/Z8MC-3PS4 (accessed Nov. 14, 2024). However, the evidence in

the record, including the internal investigation, indicates that Donegan's statement is a truthful statement of fact and opinion and is, therefore, not false. The charges brought against Donegan by Battaglia and Gilles were summarily dismissed due to lack of evidence. And the outside special prosecutor, who reviewed the subsequent internal affairs investigation, found probable cause to believe that Battaglia and Gilles may have committed the crime of tampering with evidence related to the arrest and prosecution of Donegan.

{¶ 51} Battaglia does not argue that Donegan's statement was false. He argues instead that Donegan's statement violated the parties' agreement because her statement is disparaging. He argues, citing *Ohio Edn. Assn. v. Lopez*, 2010-Ohio-5079, ¶ 16 (10th Dist.), that the word "'disparage' is a term that connotes harming a person's reputation or causing one to seem inferior." (Opening brief of appellant Carmen Battaglia, p. 32.)

{¶ 52} However, *Lopez* does not define the word "disparage" by itself; it collectively defines the terms "disparage, defame, or otherwise derogate" as terms that "connote harming a person's reputation or causing one to seem inferior." *Lopez* at ¶ 16. The plain meaning of the word "defame" means "to harm the reputation of by communicating false statements about." https://perma.cc/Y4XN-33XE (accessed Nov. 14, 2024). The word "disparage" means "to belittle the importance or value of (someone or something)." https://perma.cc/D3SE-9GYD (accessed Nov. 14, 2024).

**{¶ 53}** Nothing in Donegan's statement belittles Battaglia. She never states or implies that Battaglia was insignificant or unimportant. To the contrary, she refers to him as a "police leader," albeit a "rogue police leader," who used his position to bring unsupported charges against her. But, as previously stated, nothing in Donegan's statement was false. The use of the word "rogue" is not inaccurate. Therefore, nothing in the statement violated the non-disparagement clause of the parties' agreement, and the trial court properly granted summary judgment in appellees' favor on Battaglia's breach-of-contract claim.

**{¶ 54}** The third assignment of error is overruled.

**{¶ 55}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN T. GALLAGHER, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)